UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


PHILIP THOMPSON,

        Petitioner,

v.                                    Case Number 10-14029
                                        Honorable Thomas L. Ludington

BLAINE LAFLER,

        Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION,
DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE
TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Philip Thompson is a state prisoner confined at Muskegon Correctional Facility in Muskegon, Michigan. He was convicted in Jackson County of first-degree murder, two counts of assault, and three counts of felony firearm. Thompson was sentenced to concurrent terms of two years in prison for each felony firearm conviction, followed by concurrent terms of life imprisonment for the murder conviction and 25 to 55 years' imprisonment for the two assault convictions. On October 7, 2010, Thompson filed a pro se habeas corpus petition under 28 U.S.C. § 2254 challenging his conviction and sentence.

In his petition, Thompson raises seven arguments: (1) the trial court abused its discretion by admitting "other acts" testimony; (2) the prosecutor committed misconduct by calling the co-defendant as a witness; (3) he was denied counsel of choice; (4) trial counsel was absent during a critical stage of the proceedings; (5) trial counsel was ineffective; (6) he has newly discovered evidence that warrants a new trial, and (7) appellate counsel was "cause" for his failure to raise claims three through six on direct appeal. Respondent Blaine Lafler urges the Court to deny the

petition on grounds that Thomas's claims are not cognizable on habeas review, are procedurally defaulted, or lack merit. Having reviewed the record, the Court agrees that Thomas's claims do not warrant granting habeas corpus relief. Accordingly, the petition will be denied.

# I

The charges against Thompson arose from the shooting of Trevor Chambers and Joel Cropper on January 20, 2003, in Jackson, Michigan. Two men approached Chambers and Cropper that night at an outdoor phone booth. One of the men fatally shot Chambers in the eye after he refused to hand over the boots that he was wearing. Cropper was shot in the back as he ran away, but he survived.

Thompson was tried for the shootings before a jury in Jackson County Circuit Court. Police Officer Steven Scarpino testified that he was dispatched to the crime scene shortly before 11:00 p.m. on January 20, 2003. He observed two sets of fresh footprints in the snow behind the phone booth and a body on the ground in front of the phone booth. Identification in the victim's wallet identified the body as that of Trevor Chambers. He had a small hole in his left eye, and he was pronounced dead upon arrival at the hospital. Dr. Valery Alexandrov performed the autopsy on Chambers, and she concluded that the cause of death was a gunshot wound to the head with life-incompatible injury to the brain and that the manner of death was homicide.

Dr. Kajaovi Scott-Emuakpor treated Cropper in the emergency room at Doctors Hospital on January 20, 2003. Cropper had a single gunshot wound at the base of his shoulder blade, but the bullet was lodged in his neck. He was given pain medication and transferred to another hospital on the following day.

Thompson's co-defendant, Sean Taylor, testified that he and Thompson were friends and

that, on January 20, 2003, they went to a party store together on Greenwood Street in Jackson, Michigan. Nequita "Quita" Jackson saw them at the store and invited them to her house. The three then went to Ms. Jackson's home, which was about a five-minute walk from the party store. While they were at Ms. Jackson's home, someone named Sarah came inside and pressured them for some change. Thompson became angry, pulled out a small pistol, and pointed the pistol at Sarah. Then Thompson and Taylor left the house and walked back toward the party store. Thompson said, "Let's hit a lick," which means steal something. So they approached two men standing by a phone booth. Thompson told the man who was talking on the phone (Chambers) to get off the phone, empty his pockets, and show him his shoes. Chambers tried to grab Thompson, but Thompson pulled out a gun. Taylor turned his head at that point and heard a boom. Taylor ran, and as he was running away, he heard another gunshot.

Taylor saw Thompson later that night at his cousin Andre Bacon's house, located at the intersection of First and Washington in Jackson. While they were there, Thompson admitted that he had shot both of the victims. Thompson claimed that he did not intend to shoot them and that he planned to sell his gun. Thompson then left the house and returned fifteen minutes later. Taylor never saw the gun again. Taylor was arrested for the offense a few days later, and although he told the police the same things that he told the jury, he was not offered a favorable plea arrangement for his cooperation.

Nequita Jackson testified that she saw Thompson and Sean Taylor at a party store on the night of the shooting. The three of them left the store, walked down the street, and encountered Sarah Hall, who invited them to the house where Sarah and Nequita were living. At the house, Thompson, Taylor, and Nequita went to the back room where something heavy hit the floor three

times.  Sarah came into the room and said, "That's a gun."  She asked Thompson to leave.  They went into the kitchen where Thompson pulled the gun out of his pants and pointed the gun at Sarah.  Thompson and Taylor subsequently left the house.

Cropper testified that, on the night of the shooting, he and Chambers walked to the phone booth across from a food and beverage store.  After Chambers made a phone call, they went to the party store and bought a few things.  Then they walked back to the phone booth.  As Chambers talked to his girlfriend on the phone, Cropper saw two people slowly approach them on foot.  Taylor approached Cropper and said, "Y'all in the wrong neighborhood" and "Y'all bought a beer, huh?"  Thompson, meanwhile, pulled out a gun, cocked it, pointed it at Trevor's face, and said, "Empty your pockets" and "Give me them boots."  Taylor grabbed Cropper's coat sleeve as Thompson and Chambers pushed each other back and forth.  Thompson then shot Chambers, who fell flat on his back.  Cropper ran away when Thompson and Taylor walked toward him.  He looked back once or twice and saw the two men take Chambers's boots off his feet.  Thompson was wearing black clothing, a "hoodie,"  and a green or blue "sporting-event" coat.

Cropper explained that he was shot in the back as he ran away.  He  collapsed in the party store and was taken to the hospital where he spent the night and was given some pain medication.  He went to another hospital the next day, but the bullet was not removed from his neck for a few months.  He claimed to have no memory of photographs that the police showed him in the hospital, but he did recall identifying both Thompson and Taylor in a line-up at the county jail.

Roy Martin testified that he was working at the Greenwood Party Pack on January 20, 2003, when a shooting occurred down the street.  He recalled seeing Cropper and another person in the store about 9:30 or 10:00 p.m. that night.  Another set of two young men, whom he later learned

were Thompson and Taylor, came into the store after Cropper and his friend left the store.  He had

seen Thompson and Taylor in the neighborhood, but he did not know them personally.  Taylor was

wearing a heavy coat and a baseball cap.  Thompson was wearing a blue starter coat, and he was

carrying shoes in his hand.  Cropper later came in the store and said that he and his friend had been

shot.  When Cropper described the men who had assaulted him and his friend, Martin recognized

them as the two men who had come into his store earlier that night.  He subsequently identified the

men in some photos that the police showed him and in a lineup at the county jail.

Jessica Mettert testified that Chambers was her boyfriend and that, on the night of the

shooting, she talked to Chambers several times on the telephone.  The last call was between 9:00

and 9:40 p.m.  At one point, Chambers stopped talking for a minute, and she heard a man say

something to him.  Chambers responded to the man, "I ain't got no money."  About thirty seconds

later, Chambers informed her that he was being robbed, and he hung up the phone.  She called a few

friends who were staying a few blocks away and told them what she had heard.  The friends drove

by the crime scene and later called to tell her that Chambers was the person they had seen lying on

the ground and taken away in an ambulance without any shoes on his feet.

Detective Timothy Gonzalez testified that, on the morning after the shooting, he was

informed about a house next to the party store where some potential suspects had a green Michigan

State sports coat and a blue baseball cap with the letter "A."  These items were similar to what one

of the suspects was described as wearing during the crime.  Detective Gonzalez investigated and

ultimately cleared Jamal Reese and Eddie Collins, the two men who were staying in the house.

Detective Gonzalez talked to Cropper in the hospital.  By then, the police knew the names

of the people involved in the shooting, and they were able to assemble a photo pack.  Cropper was

medicated, but he appeared to understand Gonzalez and, in approximately thirty seconds, he identified Thompson's and Taylor's photographs in separate photo packs. Detective Gonzalez also showed the photo packs to Roy Martin, who immediately identified Thompson's and Taylor's photos as the two people who were in his party store on the night of the shooting. Both Cropper and Martin also separately identified Thompson and Taylor in a live line-up.

Martin initially informed Detective Gonzalez that he was Roy Calvin. On the following day, however, he provided his real name to Detective Gonzalez. Although Martin had outstanding warrants for his arrest, he was not offered a deal for his testimony.

During a search of Thompson's home, Detective Gonzalez seized some clothing that matched the description of the suspects' clothing on the night of the shooting. He located a BB gun and eleven .22 caliber shell casings in the basement. The casings did not match a live round found at the crime scene, and they could not be compared to the bullet that was removed from Chambers's skull because the bullet was too mutilated. A spot of blood discovered on a pair of Thompson's jeans did not match Thompson, Chambers, or Taylor.

Evidence technician Nathan Gross explained to the jury how he and another officer, along with a dog, attempted to track two sets of footprints that were visible at the crime scene. They were unable to follow one set of footprints, and the other set of footprints disappeared near an apartment complex at First and Franklin Streets.

Officer Gross described the videotape that he made of the crime scene and a set of photographs taken at the scene. He opined that the live .22 caliber round which he found at the crime scene had come from a semiautomatic weapon.

Thompson did not testify or dispute the elements of the offenses for which he was on trial.

-6-

His only witness was his probation officer, Diane Sinclair, who testified that Thompson kept a routine appointment with her on the day after the shooting and that she did not notice anything unusual about Thompson's demeanor that day.  The defense theory was that Cropper was mistaken about his identification of Thompson as the shooter and that Taylor was not credible because he admitted in a written note that he was willing to confess to anything to get off the murder case and to save his life.

## II

On December 18, 2003, the jury found Thompson guilty, as charged, of first-degree (felony) murder, assault with intent to rob while armed, assault with intent to commit murder, and three counts of felony firearm.  The trial court sentenced Thompson to life imprisonment without parole for the murder conviction and to concurrent terms of 25 to 55 years' imprisonment for the two assault convictions.  Thompson received a consecutive sentence of two years in prison for each of the felony firearm convictions.

On appeal, Thompson argued that (1) his claim of appeal should be reinstated, (2) the trial court abused its discretion by admitting "other acts" testimony, and (3) the prosecutor committed misconduct by calling Thompson's co-defendant as a witness.  The Michigan Court of Appeals vacated Thompson's conviction and sentence  for assault with intent to rob while armed on double jeopardy grounds, but affirmed his other convictions and sentences.  *See People v. Thompson*, No. 262054, 2007 WL 547708 (Mich. Ct. App. Feb. 22, 2007).  On September 24, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Thompson*, 738 N.W.2d 711 (Mich. 2007).

On September 4, 2008, Thompson filed a motion for relief from judgment, which alleged that

(1) he was denied counsel of choice, (2) his trial attorney was absent at a critical stage, (3) his trial attorney was ineffective, (4) he was entitled to a new trial on the basis of newly discovered evidence, and (5) his appellate attorney was ineffective for failing to raise the previous four issues on direct appeal.  The trial court vacated one conviction and sentence for felony firearm and then denied Thompson's motion for the reasons given by the prosecutor in his answer to the motion.  *See* Order, No. 03-0128-FC (Jackson Cnty. Cir. Ct. Feb. 4, 2009).[1]

Thompson appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)."  *People v. Thompson*, No. 294460 (Mich. Ct. App. Dec. 29, 2009).  On June 28, 2010, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Thompson*, 783 N.W.2d 371 (Mich.  2010).

Thompson filed his habeas corpus petition on October 7, 2010.  He claims that (1) the trial court abused its discretion in admitting "other acts" testimony, (2) the prosecutor committed misconduct by calling his co-defendant as a witness, (3) he was denied counsel of choice, (4) trial counsel was absent at a critical stage, (5) trial counsel was ineffective, (6) newly discovered evidence demonstrates that he is actually innocent, and (7) appellate counsel was ineffective for failing to raise claims three through six on direct appeal.

Respondent argues that claims three through five are procedurally defaulted, but Thompson disagrees.  Because a determination of whether his claims are procedurally defaulted "adds nothing

---

[1]  In his answer to Thompson's motion, the prosecutor argued that Thompson's claims lacked merit and that some of his claims were barred by Michigan Court Rule 6.508(D)(3) because Thompson failed to show "good cause" for not raising the issues in his first appeal and "actual prejudice" from the claimed errors.

but complexity to the case," the Court "cut[s] to the merits here," *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010), and will proceed to analyze the substantive merits of Thompson's claims.

### III

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S.

-9-

Ct. At 786 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87.

## IV

## A

Thompson contends that the trial court abused its discretion and deprived him of a fair trial and due process by permitting the prosecutor to admit "other acts" testimony.  The disputed evidence consisted of the testimony from Nequita Jackson and Sean Taylor that Thompson brandished a gun at Nequita's home shortly before the shooting.  The trial court ruled that the prosecutor could elicit the testimony because it was relevant evidence and because its admission would not result in unfair prejudice to Thompson.  *See* Trial Tr. Vol. I, 17-18, Dec. 16, 2003.  The Michigan Court of Appeals adjudicated Thompson's claim on direct appeal and concluded that the trial court did not abuse its discretion by admitting the evidence.

Thompson contends that the trial court violated the inherent safeguards of Michigan Rule of Evidence 404(b) when it permitted the prosecutor to admit the evidence.  He maintains that there was no proper purpose for the evidence and that the evidence was admitted for the improper purpose of showing his character and propensity to commit the offense.  Thompson also contends that the evidence was irrelevant because it did not make any element or fact more or less likely and that the evidence was unfairly prejudicial.

There is no merit to Thompson's argument because the alleged violation of the Michigan Rules of Evidence is not a cognizable claim on federal habeas corpus review.  *Hall v. Vasbinder*,

-10-

563 F.3d 222, 239 (6th Cir. 2009).  "[A] federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62,

68 (1991).  Furthermore,

> There is no clearly established Supreme Court precedent which holds that a state
> violates due process by permitting propensity evidence in the form of other bad acts
> evidence . . . .  While the Supreme Court has addressed whether prior acts testimony
> is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*,
> 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997); *Huddleston v. United States*,
> 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has not explicitly
> addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003).  Consequently, there is no Supreme Court

precedent to which the state court's decision is contrary.  Thompson's disagreement with the state

court's ruling on "other acts" evidence involves no constitutional dimension and, therefore, is not

a cognizable claim on federal habeas review.  *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

Even if the claim was cognizable on habeas review, a state court's evidentiary ruling does

not warrant habeas relief unless the ruling was so egregious and fundamentally unfair as to violate

due process.  *Bugh*, 329 F.3d at 512.  In Michigan, evidence of other  crimes, wrongs, or acts is

admissible for certain purposes, such as to prove opportunity and identity.  Mich. R. Evid. 404(b)(1).

As the Michigan Court of Appeals recognized, testimony about Thompson pointing a gun at Sarah

Hall

> was relevant to the issue of identity because it tended to make it more probable that
> [Thompson] was the person who shot and killed [Trevor] Chambers.  While the
> details of [Nequita] Jackson's and [Sean] Taylor's stories vary, their testimony
> established that [Thompson] was armed with a gun shortly before the shooting at a
> location within a few minutes walking distance of the murder scene.

*Thompson*, 2007 WL 547708, at *2.  Moreover, any prejudice to Thompson was not unfair because

> Taylor also testified that when he and [Thompson] left [Nequita] Jackson's house,
> they immediately walked to the area of the shooting and confronted the victims.  This

-11-

> evidence supports [Joel] Cropper's identification and shows that [Thompson] had the
> opportunity to commit the crimes charged.

*Id.*; *see also* Trial Tr. vol. I, 244-46, Dec. 16, 2003 (Sean Taylor's testimony that, after the incident

at Sarah Hall's home, he and Thompson walked to the telephone booth where they encountered

Chambers and Cropper).

The trial court, moreover, gave the following cautionary jury instruction when the issue arose

during Taylor's testimony:

> [T]his doesn't mean that he necessarily had the gun later. This is just something
> that's referred to as a prior act, which may or may not have some effect, with regards
> to what later occurred.

Trial Tr. vol. I, 243, Dec. 16, 2003. And at the close of the case, the trial court charged the jury not

to use evidence of Thompson's prior act with a weapon as proof that Thompson was a bad person

or had a propensity to commit crimes. The trial court stated that the evidence could "only be

considered as evidence of the Defendant's identity as the perpetrator of the crimes charged and/or

as evidence that he had the opportunity to commit the crimes charged." Trial Tr. vol. III, 675, Dec.

18, 2003. "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200,

211 (1987), and reliance on this presumption is justified here because the instructions were clear and

the circumstances were such that the jury could reasonably be expected to follow the trial court's

instructions. *See Bruton v. United States*, 391 U.S. 123, 135 (1968).

The admission of "other acts" testimony was not fundamentally unfair. Therefore, even if

Thompson's claim were cognizable on habeas review, his constitutional rights to due process and

a fair trial were not violated. He has no right to habeas relief on the basis of his first claim.

**B**

Thompson contends that the prosecutor committed misconduct and deprived him of a fair

-12-

trial by calling his co-defendant, Sean Taylor, as a witness.  According to Thompson, the prosecutor made a deal with Taylor and failed to correct Taylor's testimony when he testified that he was not given favorable treatment in exchange for his testimony.

Prosecutors may not present evidence that they know is false, *Giglio v. United States*, 405 U.S. 150, 153 (1972), nor allow false testimony to go uncorrected when it appears, *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  But to prevail on a claim that the prosecutor relied on false testimony, a habeas petitioner must show that (1) the testimony was actually false, (2) the false statements were material, and (3) the prosecutor knew the testimony was false.  *Amos v. Renico,* 683 F.3d 720, 728 (6th Cir. 2012); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).  "[A] court addressing a *Giglio* false-testimony claim asks only if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012) (quotation marks, alteration, and end citation omitted).

Before Taylor testified, he stated in the jury's absence that he had been tried and found guilty for the same incident that Thompson was on trial for and that his case was pending on appeal.  The prosecutor then informed the trial court that she had agreed with Mr. Taylor and his attorney not to use Taylor's testimony against him during his appeal.  She deferred to Thompson's counsel as to how he wanted to handle the fact that Taylor's case was pending on appeal.  Thompson's counsel did not respond to the prosecutor's comment, nor object when the trial court instructed the prosecutor not to mention the fact that Taylor's criminal case was pending on appeal.  Trial Tr. vol. I, 234-37, Dec. 16, 2003.  Taylor subsequently testified before the jury that he was arrested for the same offense as Thompson a couple of days after the crime and that he had not "cut a deal" with the

prosecutor for his testimony.  *Id.* at 256, 288.

Thompson claims that Taylor's testimony on this issue was false because he was promised that whatever he said at Thompson's trial would not be used against him on appeal.  The Michigan Court of Appeals found no merit in this claim.  The Court of Appeals determined that Taylor did not offer any false testimony about whether the prosecutor agreed not to use his testimony in his own appeal.  The Court of Appeals also noted that Thompson's counsel was given an opportunity to cross-examine Taylor about the agreement with the prosecutor, but chose not to.

Thompson is not entitled to relief on his prosecutorial-misconduct claim.  He complains that the prosecutor failed to correct Taylor's testimony, yet he failed to raise the issue himself when given permission to question Taylor about whether he made a deal with the prosecutor.  Additionally, to the extent there was a favorable agreement between the prosecutor and Taylor and to the extent that Taylor testified falsely when he denied making a deal, the allegedly false testimony was not material.  The only "deal" was the prosecutor's promise not to use Taylor's trial testimony against him on appeal from the record in that case.  There is no indication that the charges against Taylor were reduced or that the prosecutor offered to make a favorable recommendation at Taylor's sentencing in exchange for his testimony at Thompson's trial.

Furthermore, defense counsel elicited testimony that Taylor cooperated with the police because he was "sucking up for a deal."  *Id.* at 280.  Thompson's counsel also brought out the fact that, while Taylor was confined in prison or jail, he delivered a note to a guard indicating that he would confess to anything to get off the murder case.  Taylor admitted at Thompson's trial that the purpose of the note was to get a deal.  *Id.* at 281-85.

And even the prosecutor conceded that Taylor was not entirely credible.  She stated that they

-14-

would not be in court if the case depended solely on Taylor's testimony and that she would never

ask the jury to believe everything Taylor had to say.  She also said that Taylor's testimony was

"nothing more than what you would expect him to say" and that Taylor was "whitewashing himself"

during his testimony.  Trial Tr. vol. III, 653-56, Dec. 18, 2003.

So, because Taylor's questionable credibility was brought to the jury's attention, and because

there was other evidence of Thompson's guilt, there is not a reasonable likelihood that Taylor's

testimony concerning a deal with the prosecutor affected the jury's judgment.  Consequently,

Taylor's allegedly false testimony about not having a deal with the prosecutor was not material

evidence, and Thompson has no right to relief on the basis of his claim that the prosecutor allowed

false testimony to go uncorrected.

## C

Thompson next alleges that he was denied his right to counsel of choice when the trial court

refused to appoint substitute trial counsel for him in the face of an irreconcilable conflict.  Thompson

raised this issue in his motion for relief from judgment.  The trial court rejected the claim on the

basis of the prosecutor's arguments that Thompson was not entitled to a lawyer of his choice, that

his trial attorney did not have a conflict of interest, and that there was no fundamental disagreement

leading to an impasse.

## 1

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal

case the right to the assistance of counsel in his or her defense.  *Faretta v. California*, 422 U.S. 806,

807 (1975).  "[A]n element of this right is the right of a defendant who does not require appointed

counsel to choose who will represent him."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144

(2006).

"[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id*. at 151; *accord United States v. Marrero*, 651 F.3d 453, 477 (6th Cir. 2011); *Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008). Rather, "the Sixth Amendment requires the substitution of appointed counsel upon a showing of good cause." *United States v. Marrero*, 651 F.3d at 477-78 (citing *United States v. Iles*, 906 F.2d 1122, 1130–31 (6th Cir. 1990)).

"Good cause" includes "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with [defense counsel]." *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985).

> When reviewing a trial court's denial of a motion to substitute counsel, [courts] consider four factors:
>
> > (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.
>
> *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). If the defendant's motion would "necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *Id*. at 467.

*Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011).

**2**

Exhibits to the habeas petition reveal that, on November 28, 2003, Thompson wrote a letter to the trial court requesting a new lawyer on grounds that his trial attorney previously represented prosecution witness Roy Martin, counsel did not visit him until November 16, 2003,[2] and counsel

---

[2]  The trial began on December 16, 2003.

was not interested in the truth. *See* Pet. for Writ of Habeas Corpus, App. A. This letter was sufficient to trigger the trial court's duty to inquire about Thompson's relationship with his attorney.

Although the trial court never directly questioned Thompson about his letter, it did not completely ignore his concerns. *Cf. Cottenham v. Jamrog*, 248 F. App'x 625, 636 (6th Cir. 2007) (granting the writ of habeas corpus where the trial court failed to promptly grant a hearing to investigate the defendant's repeated objections to being represented by an attorney retained by his family); *Linton v. Perini*, 656 F.2d 207, 211-12 (6th Cir. 1981) (granting the writ where the trial court summarily denied the defendant's motion for substitution of counsel). The court acknowledged Thompson's letter at a pretrial hearing held on December 5, 2003, and addressed Thompson's concerns about witnesses with defense counsel. The trial court also addressed the matter of witnesses when the trial commenced on December 16, 2003. Thompson raised no complaints about his attorney then or at any other time during his trial. In the absence of any additional objections to defense counsel's representation, the trial court must have reasonably assumed that any problems between Thompson and his attorney had been resolved.

The request for substitution of counsel was also untimely. Although counsel was appointed on or about August 19, 2003, Thompson did not write his letter to the trial court until November 28, 2003, two and a half weeks before trial. Such a request is untimely. *United States v. Marrero*, 651 F.3d at 464-65 (substitution-of-counsel request untimely when submitted three weeks before trial); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (untimely when submitted two weeks before trial). And because substitution of counsel would have delayed the trial, which had already been adjourned six times, the public's interest in the prompt and efficient administration of justice weighed in favor of proceeding to trial.

-17-

Finally, the record does not reveal a total lack of communication that prevented an adequate defense. At a pretrial hearing on December 5, 2003, defense counsel stated that he and Thompson had talked about defense witnesses that morning, and Thompson admits that defense counsel visited him three times before trial. Although Thompson contends that a conflict of interest occurred because counsel ceased to function as an advocate, *see Entsminger v. Iowa*, 386 U.S. 748, 751 (1967) ("appointed counsel must function in the active role of an advocate, as opposed to that of amicus curiae"), the record indicates that defense counsel was a zealous advocate for Thompson.

Furthermore, Thompson does not dispute Respondent's claim that trial counsel ceased being Roy Martin's attorney two days after he was appointed as Thompson's attorney. And even though "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980), "*Cuyler* covers only cases of 'joint representation at trial.'" *Benge v. Johnson*, 474 F.3d 236, 244-45 (6th Cir. 2007) (quoting *Smith v. Hofbauer*, 312 F.3d 809, 815 (6th Cir. 2002)). Thompson's claim pertains to "a successive (previous unrelated representation of a co-defendant and/or trial witness) rather than a joint (simultaneous trial of co-defendants) or a multiple (co-defendants at severed trials) representation." *Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir. 2004). "The presumed prejudice standard for ineffectiveness claims based on a conflict of interest detailed in *Cuyler* . . . is inapplicable to cases of successive representations." *Id.*

Thompson has not demonstrated the existence of an irreconcilable conflict between himself and his attorney or a complete breakdown in communication. He had no right to a "meaningful relationship" with his attorney, *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983), and any disagreement between himself and his attorney apparently was not "so great that it resulted in a total lack of

communication preventing an adequate defense." *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008) (*quoting United States v. Iles*, 906 F.2d at 1130 n.8). The trial court therefore did not abuse its discretion by declining to allow substitution of counsel.

## D

In a related claim, Thompson alleges that he was denied his constitutional right to counsel because his trial attorney was absent at a critical stage of the proceedings. The basis for this claim is trial counsel's alleged failure to conduct meaningful discussions with Thompson prior to trial.

The trial court adopted the prosecutor's argument that this claim lacked merit because a lawyer's off-the-record discussions with his client before trial is not a "critical stage" of the proceedings. However, "[i]t is beyond dispute that '[t]he Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process,'" *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013) (*per curiam*) (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004), and this "constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012). "The pre-trial period constitutes a 'critical period' because it encompasses counsel's constitutionally imposed duty to investigate the case." *Mitchell v. Mason*, 325 F.3d 732, 742-43 (6th Cir. 2003). A defendant need not show

> probable effect upon the outcome . . . where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. But only in "circumstances of that magnitude" do [courts] forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict.

*Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (internal and end citations omitted).

-19-

Thompson admits that his attorney visited him three times before trial and spent a total of thirty minutes with him.  Thus, he was not denied counsel during the critical pretrial stage.  *See Dick v. Scroggy*, 882 F.2d 192, 197 (6th Cir. 1989) (finding that an attorney's meeting with the defendant for approximately thirty to forty-five minutes before trial did not amount to ineffective assistance of counsel); *cf. Mitchell v. Mason*, 325 F.3d at 742-44 (concluding that petitioner was denied counsel at a critical stage of the proceedings because his attorney met with him for no more than six minutes in the seven-month period before trial and was suspended from the practice of law for a month immediately before trial).

Thompson nevertheless contends that his time with defense counsel was unproductive because counsel used the time to introduce himself, yell at him, and express his belief that Thompson was guilty and deserved to spend the rest of his life in prison.  These allegations "address the quality of [his attorney's] pretrial representation . . . ; they do not assert a virtual absence of representation that would create per se prejudice."  *Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007). The Court therefore rejects Thompson's claim that he was denied counsel at a critical stage of the proceedings.

### E

In still another claim about trial counsel, Thompson alleges that his attorney deprived him of his Sixth Amendment right to effective assistance of counsel.  The trial court disagreed and adopted the prosecutor's argument that none of Thompson's claims about his trial attorney had merit.

To prevail on his claims here, Thompson must show that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The "deficient performance" prong "requires showing that counsel made

-20-

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

To demonstrate that counsel's performance prejudiced the defense, Thompson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

## 1

Thompson's first claim about trial counsel is that counsel failed to either present alibi witnesses at trial or file a proper alibi notice. The failure to investigate fully and present an alibi defense can constitute ineffective assistance of counsel. *See Foster v. Wolfenbarger*, 687 F.3d 702, 706-10 (6th Cir. 2012). The defense is consistent with and, in fact, complementary to a theory of mistaken identification. *Id*. at 708.

Thompson claims that he wanted to present Andre Bacon, Roberta Mauer, and two other unnamed witnesses to testify that he was not present during the crime. The transcript of a pretrial conference held about a week and a half before trial indicates that defense counsel was aware of Andre Bacon and Roberta Mauer and that he interviewed Andre Bacon at least one time. *See* Pretrial Tr. 4-7, Dec. 5, 2003. And, on the first day of trial, defense counsel asked the trial court to mention Roberta Mauer, Terry Whitley, Andre Bacon, and others during *voir dire* as possible witnesses. Trial Tr. vol. I, 6–7, Dec. 16, 2003. The record does not indicate why those witnesses

-21-

did not testify at trial.

Thompson, nevertheless, has not submitted any affidavits from potential alibi witnesses, nor shown that any of the potential witnesses would have been willing and able to testify that he was elsewhere when the crime occurred. Even if his counsel had produced the witnesses, the testimony against Thompson was compelling, despite the lack of forensic evidence. Any alibi witnesses would have had to rebut the testimony of witnesses who saw Thompson in the vicinity of the crime scene shortly before the shooting. The alibi witnesses also would have had to convince the jurors that eyewitnesses testimony from the trial, including that of Thompson's co-defendant's, contained lies, or were simply mistaken.

Thompson has failed to show that he had strong alibi witnesses and that he was deprived of a substantial defense. Therefore, the result of the trial in all likelihood would not have been different but for counsel's alleged failure to investigate and call additional witnesses or file a proper alibi notice. Defense counsel's alleged omissions did not amount to ineffective assistance of counsel.

**2**

Thompson asserts that trial counsel was ineffective for failing to rebut effectively the "other acts" evidence. As noted above, this evidence consisted of Sean Taylor's and Nequita Jackson's testimony that Thompson pointed a gun at Sarah Hall shortly before the shooting. *Id*. at 242-43, 262, 300, 315, 318.

**a**

First, Thompson contends that defense counsel should have called Sarah Hall as a witness to testify that she did not see Thompson with a gun. Thompson states that Hall testified in his favor at a pretrial hearing, but there is no record of Ms. Hall testifying at any pretrial hearings in this case.

Thompson merely speculates that Hall would have been available and willing to testify that he did not have a gun on the night of the crime. Therefore, defense counsel was not ineffective for failing to call Sarah Hall.

**b**

Thompson contends that defense counsel argued inconsistencies that did not exist by stating that only one witness saw Thompson with a gun before the shooting. This was incorrect, because, as Thompson correctly points out, both Nequita Jackson and Sean Taylor testified that Thompson had a gun at the house. *Id*. at 262, 300. Nevertheless, defense counsel made the disputed comment during his opening statement. He explained that one witness would testify she saw Thompson with a gun before the shooting, but he anticipated that someone else would testify that she did not see Thompson with a gun before the shooting. *Id*. at 142. Because counsel was merely stating what he expected the testimony to be, his comment did not amount to deficient performance and could not have prejudiced the defense.

Thompson claims that defense counsel also attempted to create an inconsistency when he said:

> But [Nequita Jackson] says that, in front of everybody, Philip pulls a gun out and points it right at Sarah Hall – Sarah Walters. We don't hear from Sarah Walters. But Sean Taylor says, "I never saw it. I didn't see that." And Nequita's very clear just to make sure that he doesn't see that. He says, "I saw it. I saw him point it at her." Nequita doesn't.

Trial Tr. vol. III, 626, Dec. 18, 2003.

Counsel's comments are confusing. Counsel appears to be saying that Nequita Jackson saw Thompson with a gun at Sarah Hall's home, but Sean Taylor denied seeing him with a gun. Counsel then appears to contradict himself by saying that Taylor saw Thompson with a gun, but Jackson did

-23-

not.  Thompson concludes from the confusing comments that the only inconsistency to be gleaned from counsel's argument is that Taylor said he saw the gun being pointed at Sarah Hall, but Nequita Jackson said Taylor did not see it.  Thompson says this is incorrect because Nequita said Taylor was looking at them.

Thompson asserts that counsel's attempt to demonstrate these non-existent inconsistencies served to confuse the jury about the testimony.  But the trial court instructed the jurors that the attorneys' statements and arguments were not evidence and that the jurors should accept only the comments that were supported by the evidence or by their own common sense and general knowledge.  The trial court also instructed the jurors that they were the triers of fact and that they should decide which testimony to believe.  *Id.* at 664-67.  In light of the trial court's instructions, defense counsel's confusing comments did not prejudice the defense.

**c**

Next, Thompson asserts that counsel should have pointed out the real inconsistencies in Sean Taylor's and Nequita Jackson's testimony.  These inconsistencies, according to Thompson, are: Sean Taylor's testimony that nobody was at Sarah Hall's home when they arrived there, Trial Tr. vol. 1, 241, and Nequita Jackson's testimony that Sarah was already there, *id.* at 297, 313-14; Sean Taylor's testimony that he was carrying Thompson's shoes when they went to the store, *id.* at 261, and Nequita's testimony that no one was carrying anything at the store, *id.* at 307; Sean Taylor's testimony that Nequita invited them to Sarah's house, *id.* at 260, and Nequita's testimony that Sarah invited them to her house, *id.* at 312; and Sean Taylor's testimony that Thompson pulled out a gun when Sarah Hall asked for money, *id.* 242, and Nequita's testimony that Sarah did not ask for any money, *id.* at 314.

-24-

All of these differences in testimony point to minor discrepancies in the facts. None of them go to the heart of the case as to whether Thompson was the person who shot Trevor Chambers and Joel Cropper. Therefore, defense counsel was not ineffective for failing to point out the inconsistencies.

**d**

In his final argument about defense counsel's handling of "other acts" evidence, Thompson alleges that defense counsel was ineffective for arguing that Nequita Jackson was a credible witness. Trial Tr. vol. III, 627, 635, 645, Dec. 18, 2003. Although Nequita was a prosecution witness, defense counsel's point was that Nequita was being truthful when she testified that Thompson was on the other side of town when the crime was being committed. *Id.* at 627, 635. Because this argument supported Thompson's defense that he was not the shooter, counsel was not ineffective for making the argument.

Thompson nevertheless maintains that there was no strategic purpose in defense counsel speculating that Thompson and Sean Taylor were on the other side of town to "hit a lick," that is, to commit a robbery. *Id.* at 627. The comment, however, was fleeting, and it could have led the jury to believe that Thompson's intent that night was to commit a robbery as opposed to a murder. To the extent that the argument may have caused the jury to question Thompson's intent to commit more serious crimes, defense counsel was not constitutionally ineffective for making the argument.

**3**

Thompson asserts that defense counsel was also ineffective for failing to move to suppress clothing and eleven .22 caliber casings that the police seized from Thompson's home. Although Detective Gonzalez testified that he had a search warrant for his first search of Thompson's home

Trial Tr. vol. II, 466, Dec. 17, 2003, and that Thompson's mother consented to the second search, *id*. at 467, Thompson disagrees.  He claims that the paper which Detective Gonzalez showed his mother before the first search was not a real search warrant and that his mother's consent to the second search was involuntary because she thought she had no choice in the matter.

To prevail on his claim, Thompson must prove that his Fourth Amendment claim is meritorious and there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  Even if the searches in this case were invalid, the items seized were insignificant.  The casings found in Thompson's home did not match the .22 caliber bullet found at the crime scene. Trial Tr. vol. II, 499, Dec. 17, 2003.  They also could not be compared to the bullets removed from the victims.  The bullet recovered from Trevor Chamber's head was too mutilated for comparison, *id*. at 471-72, and the police failed to recover the bullet removed from Joel Cropper's body, *id*. at 501-02.

The clothing also had limited value.  The prosecutor, in fact, conceded that no juror would be able to match a single piece of clothing in evidence to Thompson at the time of the crime.  Trial Tr. vol. III, 646-47, Dec. 18, 2003.  Thus, Thompson was not prejudiced by his attorney's failure to attempt to suppress the clothing and the bullet casings.

**4**

Thompson next claims that defense counsel was ineffective for failing to move to suppress the identification testimony.  Thompson claims that the pretrial identification by Joel Cropper was suggestive because Cropper saw Thompson's name and picture in the newspaper before the preliminary examination and because Cropper saw Thompson's name on a subpoena.

A pretrial confrontation violates the right to due process of law if the confrontation was

"unnecessarily suggestive and conductive to irreparable mistaken identification." *Neil v. Biggers*. 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification . . . ." *Id.* at 198.

Due process, however, "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement.*" *Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012) (emphasis added); *see also Howard v. Bouchard*, 405 F.3d 459, 469-70 (6th Cir. 2005) (stating that "[u]nnecessary suggestiveness generally depends 'upon whether the witness's attention was directed to a suspect *because of police conduct*'") (emphasis added) (quoting 2-5 Crim. Con. Law § 5.05(2)(b) (2004)). Improper police action is a prerequisite to judicial checks on the reliability of an identification because "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays . . . ." *Perry v. New Hampshire*, 132 S. Ct. at 726.

Joel Cropper testified that his aunt showed him a newspaper article with Thompson's picture in it while he was in the hospital. Trial Tr. vol. II, 406-07, Dec. 17, 2003. Because the allegedly suggestive circumstance was not procured by law enforcement officials, defense counsel was not ineffective for failing to move to suppress the identification testimony. Counsel chose instead to cross-examine Cropper about the newspaper article, *id*. at 406-11, 414-17, and to mention the issue in closing arguments, Trial Tr. vol. III, 629, 636-37, Dec. 18, 2003.

Furthermore, the record indicates that Cropper identified Thompson in a photo array *before* the newspaper published any articles or pictures about the crime. Trial Tr. vol. II,  457-58, Dec. 17,

-27-

2003. And, because Thompson has not alleged that the photo array was unnecessarily suggestive, it cannot be said that Cropper's viewing of the newspaper article and pictures was conducive to irreparable mistaken identification.

Even if the Due Process Clause were implicated and the pretrial identification procedures were suggestive, the question then is whether, under the totality of the circumstances, the identification was reliable despite a suggestive confrontation procedure. *Neil v. Biggers*, 409 U.S. at 199.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200.

Cropper saw the criminals slowly walk toward him and Chambers, Trial Tr. vol. II, 356, Dec. 17, 2003, and he was standing nearby when Thompson interacted with Chambers and ultimately shot him. Although it was dark outside, he claimed to have "pretty good eyesight." *Id*. at 399. The Court concludes that Cropper had a good opportunity to view the criminals.

Cropper's attention during the crime also was uninhibited. He testified that he focused on Thompson and the gun, which was pointed at Chambers. *Id*. at 404-05. His recall of certain details of the crime during his trial further supports the conclusion that he was paying close attention. He recalled that Thompson pulled a black pistol from the back of his pants, pointed it at Trevor's face, and instructed Trevor to put the phone down and hand over his boots. *Id*. at 359-61.

Thompson does not dispute the accuracy of Cropper's description of him, and he concedes that the time between the confrontation and identification was not long. As for the level of certainty,

Cropper testified that he had no problem identifying Thompson and Taylor in the lineup. *Id.* at 377. At trial, he had no doubt that Thompson was the man who shot Trevor Chambers, and he stated that he never forgot a face. *Id.* at 413-14.

Thus, there was an independent basis for Joel Cropper's identification of Thompson. If defense counsel's failure to challenge the pretrial identification procedure amounted to deficient performance, the deficient performance did not prejudice Thompson.

**5**

Thompson contends that his attorney did not properly argue his misidentification defense. More specifically, Thompson asserts that defense counsel improperly argued that Joel Cropper knew Thompson, failed to highlight inconsistencies in Cropper's testimony, and failed to produce a witness who would have testified that Cropper said he could not identify the shooter. For the reasons given below, Thompson's argument is without merit.

**a**

Cropper testified at trial that he did not know Thompson. *Id.* at 356. Defense counsel, therefore, was wrong when he stated in his opening statement, Trial Tr. vol. I, 139-41, 144, Dec. 16, 2003, and closing argument, Trial Tr. vol. III, 629-30, 637-38, Dec. 18, 2003, that Joel Cropper knew Thompson. His comments tended to undermine the misidentification defense, because a person is probably more likely to misidentify someone that he or she does not know. Nevertheless, the jury was informed that Cropper identified Thompson in a photo array and at a line-up, and that Cropper had no doubt Thompson was the man who shot Trevor Chambers. Sean Taylor also was an eyewitness to the crime and he, too, testified that Thompson shot Chambers. Given the strong case against Thompson, defense counsel's misstatement about Cropper knowing Thompson did not

-29-

prejudice Thompson.

### b

Thompson also asserts that defense counsel was deficient in failing to point out how Joel Cropper's testimony differed from that of other witnesses. The discrepancies, however, pertain to minor details such as whether the perpetrators walked or ran away from the crime scene, whether Chambers hung up the telephone or left it swinging off the hook, whether the perpetrators set down their shoes on a parking block or left no footprints on the parking blocks, and whether Chambers bought two or three beers at the party store. Defense counsel was not ineffective for failing to bring such minor discrepancies to the jury's attention. Nor was he ineffective for failing to challenge Cropper's various descriptions of the suspects' clothes. The clothes were not an important factor in the case, because other witnesses corroborated Cropper's testimony.

### c

Thompson asserts that defense counsel was remiss for failing to contact a witness who would have testified that Joel Cropper had said he could not identify the shooter. This claim lacks merit because Thompson has not submitted an affidavit from the potential witness, nor even named the witness who could have provided such testimony

### 6

Thompson states that trial counsel was ineffective for failing to prevent, or object to, Detective Timothy Gonzalez's testimony that one could merely look at the shoes seized from Thompson's bedroom and determine that they matched pictures of the footprints at the crime scene. Trial Tr. vol. II, 513, Dec. 17, 2003. Thompson contends that this remark was expert testimony, which Detective Gonzalez was not qualified to give.

Counsel's failure to object to the remark likely did not prejudice the defense, given the eyewitness testimony in the case. And even though the remark occurred during defense counsel's cross-examination of Detective Gonzalez, defense counsel obviously was trying to point out a deficiency in the detective's investigation: his failure to make use of an available expert on foot impressions. This strategy, even if unsuccessful to some extent, did not rise to the level of ineffective assistance.

**7**

Thompson argues that defense counsel was ineffective for failing to inform the jury that Sean Taylor made a deal with the prosecutor. As noted above, the only "deal" was the prosecutor's promise not to use Taylor's trial testimony during Taylor's appeal from his own conviction.

The trial court appropriately described the evidence as a two-edged sword. Evidence of a deal between Taylor and the prosecutor could have led the jury to believe that Taylor was testifying against Thompson solely to benefit himself. On the other hand, the jury could have inferred from the evidence that the prosecutor thought Taylor was credible enough to warrant leniency by promising not to mention his testimony on appeal.

Instead of mentioning the agreement between Taylor and the prosecutor, defense counsel elicited testimony that Taylor had cooperated with the police because he was "sucking up for a deal" and that Taylor had said he would confess to anything to get off the murder case. Because this was a reasonable approach, Thompson has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). After all, "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689.

-31-

**8**

Thompson maintains that his trial attorney should have brought out inconsistencies in the testimony of prosecution witnesses.  The alleged inconsistencies concern whether Joel Cropper used Vicodine on the date of the preliminary examination, whether he went to the store more than once before the shooting, whether Sean Taylor said anything when he approached Cropper at the phone booth, whether Taylor grabbed Cropper, whether Taylor approached Cropper after Thompson shot Chambers, and whether Taylor was carrying any shoes that night.

Discrepancies in the facts can be expected at a criminal trial, and the discrepancies mentioned by Thompson do not pertain to the question of identity or whether Thompson was guilty as charged.  Defense counsel cross-examined each prosecution witness, and he was not ineffective for failing to question the witnesses about minor discrepancies in the facts.

**9**

Thompson alleges that his trial attorney should have objected when the prosecutor stated during closing arguments that Joel Cropper's testimony was supported by the evidence and the testimony of other witnesses.  While it is true that prosecutors may not misrepresent the facts in evidence, *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), the things about which Thompson complains concern mere discrepancies:  whether Thompson and Sean Taylor were carrying anything when they approached the victims; whether Taylor said anything at the time; whether Taylor was wearing a sporting-event coat with markings on it; whether Thompson ejected a live round before shooting Chambers; whether Thompson and Taylor walked or ran away after the shooting; and whether the tracking dog followed the suspects' trail to the house where Taylor said he and Thompson went.

The prosecutor's comments, even if incorrect, "did not bear on the key issues in the case and had little possibility of affecting a jury verdict that rested on ample evidence." *Perkins v. McKee*, 411 F. App'x 822, 831 (6th Cir. 2011) (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).  Furthermore, the trial court instructed the jurors that the attorneys' statements and arguments were not evidence and that the jury should only accept the lawyers' statements if the statements were supported by the evidence or by their own common sense and general knowledge. Trial Tr. vol. III, 664, Dec. 18, 2003.  "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*,  481 U.S. at 211, and a trial court generally can correct improprieties in a prosecutor's closing argument "by instructing the jury that closing arguments are not evidence." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).  Defense counsel therefore was not ineffective for failing to object to the prosecutor's closing arguments.

## 10

Thompson's tenth and final claim about trial counsel is that the cumulative effect of counsel's errors requires a new trial.  This claim lacks merit because errors that would not individually support habeas relief cannot be cumulated to support habeas relief.  *Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) (quoting *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010)).

## F

Thompson claims to have newly discovered evidence that he is actually innocent of the crimes for which he was convicted.  The new evidence consists of a disciplinary memorandum issued by the Chief of Police for the City of Jackson on December 13, 2006.  The memorandum

concerns Timothy Gonzalez, the lead detective in Thompson's criminal case. Among other things, the memorandum states that, during the past several years, Detective Gonzalez mishandled evidence and documents, was untruthful, and conducted incomplete investigations in homicide, drug, and gun cases. Thompson concludes from this memorandum that Detective Gonzalez's investigation of his case was incomplete. He argues that, if the jury had seen this report, Detective Gonzalez's testimony and investigation would have taken on a different meaning, and no reasonable juror would have found him guilty beyond a reasonable doubt. The trial court disagreed and adopted the prosecutor's argument that the newly discovered evidence did not entitle Thompson to a new trial because Thompson could not show a different result was probable on retrial.

Thompson asserts that the new evidence overcomes any procedural bar to review of habeas claims three through six. The Court, however, has not treated Thompson's claims as procedurally defaulted, and "a claim of 'actual innocence' is not itself a constitutional claim" for which habeas relief may be granted. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Even if it were, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera v. Collins*, 506 U.S. at 417). A claim of innocence requires showing that, in light of some new evidence, "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

The memorandum in question does not say that Detective Gonzalez was dishonest or mishandled evidence in Thompson's case. Furthermore, the jury was made aware of inadequacies in Detective Gonzalez's investigation. Defense counsel elicited testimony that Detective Gonzalez failed to: obtain a search warrant for Sean Taylor's home; acquire the bullet removed from Joel Cropper's neck; show the clothing removed from Thompson's home to witnesses in the case; send

-34-

Thompson's shoes to the crime lab for comparison to the drawings or photographs of footprints at the crime scene; and interview two men that the police stopped and released on the night of the crime.  Trial Tr. vol. II, 498, 501-02, 507-15, Dec. 17, 2003.

In light of defense counsel's thorough cross-examination of Detective Gonzalez and the substantial eyewitness testimony in the case, Thompson has not met the extraordinarily high threshold needed to prove actual innocence.  The Court therefore declines to grant the writ of habeas corpus on the basis of Thompson's claim regarding newly-discovered evidence.

## G

With his seventh and final habeas claim, Thompson alleges that his appellate attorney was ineffective for failing to raise claims three through six regarding trial counsel and newly-discovered evidence about Detective Gonzalez on direct appeal.  Thompson contends that these issues are clearly stronger than the issues appellate counsel did present on appeal.

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance," *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011), but an attorney is not required to raise every non-frivolous issue on appeal,  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  To demonstrate that appellate counsel was ineffective, Thompson must show (1) that his attorney unreasonably failed to discover and raise nonfrivolous issues on appeal and (2) a reasonable probability that he would have prevailed on appeal but for his appellate attorney's failure to raise the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694).

For reasons given in the discussion above, the issues appellate counsel did not raise on direct appeal lack merit.  Consequently, there is not a reasonable probability that Thompson would have prevailed on appeal had counsel raised the issues.  "Appellate counsel cannot be found to be

ineffective for 'failure to raise an issue that lacks merit.'" *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

## V

The state court opinions and orders in this case were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable determinations of the facts. Thompson's petition will be denied.

## VI

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the petitioner] must first seek and obtain a [certificate of appealability]." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. at 327 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Reasonable jurists could not debate whether Thompson's claims should have been resolved differently or deserve encouragement to proceed further. A certificate of appealability will not be granted. Further, leave to proceed *in forma pauperis* on appeal is denied as any appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

## VII

Accordingly, it is **ORDERED** that Thompson's petition for a writ of habeas corpus, ECF

No. 1, is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED** because Thompson's claims are not adequate to deserve encouragement to proceed further.

It is further **ORDERED** that permission to proceed *in forma pauperis* on appeal is **DENIED** because an appeal could not be taken in good faith.

Dated: December 27, 2013                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail, and upon Philip Thompson, #401331, Muskegon Correctional Facility, 2400 S. Sheridan Drive, Muskegon, MI 49442-6299 by first class U.S. mail, on December 27, 2013.

                                            s/Tracy A. Jacobs
                                            TRACY A. JACOBS